Jane DOE No. 1, a minor child, by her parent and next friend Mary ROE; Jane Doe No. 2; and Jane Doe No. 3, a minor child, by her parents and next friends Sam Loe and Sara Loe

v.

BACKPAGE.COM, LLC, Camarillo Holdings, LLC (f/k/a Village Voice Media Holdings, LLC), and New Times Media, LLC.

Civil Action No. 14–13870–RGS.

United States District Court, D. Massachusetts.

Signed May 15, 2015.

---

**18.** The Court does not reach the question of whether the complaint alleges an injury in fact.

Ching–Lee Fukuda, Ropes & Gray LLP, New York, NY, John T. Montgomery, Aaron M. Katz, Christine Ezzell Singer, Dara A. Reppucci, Jessica L. Soto, Ropes & Gray LLP, Boston, MA, for Jane Doe No. 1, a minor child, by her parent and next friend Mary Roe; Jane Doe No. 2; and Jane Doe No. 3, a minor child, by her parents and next friends Sam Loe and Sara Loe.

Ambika K. Doran, James C. Grant, Davis Wright Tremaine LLP, Seattle, WA, Robert A. Bertsche, Jeffrey Jackson Pyle, Prince Lobel & Tye LLP, Boston, MA, for Backpage.com, LLC, Camarillo Holdings, LLC (f/k/a Village Voice Media Holdings, LLC), and New Times Media, LLC.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

STEARNS, District Judge.

In this litigation, two important public policies collide head on—the suppression of child sex trafficking and the promotion of a free and open Internet. Plaintiffs Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 (the Doe plaintiffs) seek redress in the form of money damages from defendants Backpage.com, LLC; Camarillo Holdings, LLC (f/k/a Village Voice Media Holdings, LLC); and New Times Media, LLC. The Doe plaintiffs allege that they were molested and repeatedly raped after being advertised as sexual wares on defendants' website, backpage.com (Backpage). Defendants contend that most of the Doe plaintiffs' claims are preempted by the Communications Decency Act (CDA), 47 U.S.C. § 230, and that the remaining intellectual property claims (unauthorized use of a person's image and copyright infringement) fail to state claims upon which relief may be granted.

## BACKGROUND [1]

Backpage is an online classifieds forum that groups goods and services advertised for sale by geographic location and subject matter. At issue in this case is the forum's adult entertainment section and its subcategory offering the services of "es-

---

1. On a motion to dismiss, the court accepts as true the well-pleaded facts of a complaint.

152

corts." The Doe plaintiffs allege that in the scungy world of adult entertainment, this section of Backpage is a notorious haven for promoters of the illicit sex trade, and even more troubling, the trafficking of children for sex. The Doe plaintiffs contend that Backpage's business model depends in large part on the revenues it earns from its involvement in the trafficking of children. To this end, Backpage is alleged to have structured its adult entertainment section to lightly camouflage its illegal content to divert the attention of law enforcement. In support, the Second Amended Complaint (SAC) marshals the following facts:

- Backpage charges a fee for posting advertisements in the adult entertainment section (and not in most other licit areas of the website). The fee for the "adult" ads ranges from $12.00 to $17.00 per posting. Backpage charges an additional fee for each reposting of an adult ad, and for featuring the ad (with a selection of text and photos) prominently on the right side of the website.

- Backpage does not require posters in the adult entertainment section to verify their identity. The website also does not require that the poster use a registered credit card linked with a name and address, and accepts anonymous payments in the form of prepaid credit cards, or pseudo-currencies, such as Bitcoin.

- Backpage does not require a poster to verify the age of an "escort" whose services are offered on the website. Although the website will not accept an ad when the poster enters an age of less than 18, it will permit the poster to immediately re-enter an assumed age.

- Backpage does not require any verification of the telephone numbers posted in its adult entertainment section. It also permits users to enter telephone numbers using any combination of character strokes rather than in the more traceable (by law enforcement) nominal numbers required in other sections of the website (such as "twoO13fourFive678niNe" rather than "201–345–6789"). Backpage does not require posters in the adult entertainment section to use their actual email addresses, but provides an email forwarding service that protects a poster's anonymity.

- Backpage strips out metadata associated with photographs (such as date, time, geolocation and other identifying information) before publishing the photographs on its website. This prevents law enforcement from effectively searching for repostings of the same photograph.

- While Backpage bars the use of certain words and phrases through its "automatic filtering" system, such as "barely legal," "high school," "innocent," "sex," "blow job," "hand job," "schoolgirl," "teen", and "teenage," it readily permits the use of suggestive circumlocutions like "girl," "young," "underage," and "fresh." It also does not filter out easily recognizable abbreviations of forbidden words, such as "brly legal" or "high schl."

The Doe plaintiffs further allege that defendants have waged a phony war against sex traffickers to divert attention from their illegal activities. While Backpage claims that its adult entertainment advertisements are screened by trained moderators, it has refused to install readily available technology that would far more accurately detect the trafficking of children. According to the Second Amended Complaint, Backpage's highly touted claim to make regular referrals to

the National Center of Missing & Exploited Children has led to few instances of identification or rescue. Although Backpage will on request remove an offending ad in the geographic location in which it is posted, it does nothing to report or remove the identical ad posted in other geographical areas, or other ads involving the same child. The overall effect, the Doe plaintiffs contend, is to create a Potemkin-like "facade of concern" that obscures the shady source of its filthy lucre. SAC ¶ 34.

Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 aver that they have been each personally harmed by defendants' unsavory business practices. Jane Doe No. 1 was first trafficked by pimps on Backpage after running away from home in February of 2012, when she was 15 years old. She was again sold on Backpage in March of 2013, after she ran away a second time. Between June of 2013 and September 10, 2013, her "services" were advertised on Backpage each and every day. As a result of the ads, she engaged in 10 to 12 sex transactions daily with adult men in Massachusetts and Rhode Island. Her pimp moved her from town to town every two days to avoid detection. Jane Doe No. 1 appeared on some 300 ads on Backpage and was raped over 1,000 times.

Backpage listed each ad featuring Jane Doe No. 1 as an offer of "escort" services, a common euphemism for prostitution. The Jane Doe No. 1 ads included known signifiers for child prostitution such as "young," "girl," "fresh," "tiny," "roses," and "party." Jane Doe No. 1's pimp provided a prepaid mobile phone and a prepaid credit card to conceal Jane Doe No. 1's identity when Jane Doe No. 1 placed ads on Backpage. When Jane Doe No. 1 attempted to enter her true age (which was under 18) during the purchase of an ad, Backpage would instruct her to enter her age as 18 or older. Photographs of Jane Doe No. 1 (with her facial features obscured, but at least on one occasion displaying a unique tattoo) accompanied all of her ads.

Jane Doe No. 2 was trafficked on Backpage by her pimp during various periods between 2010 and 2012 at different locations in Massachusetts. She first appeared on Backpage when she was 15 years old, after she had absconded from a residential program. Ads featuring Jane Doe No. 2 were posted either by her pimp or an older woman who worked with him (his "bottom"). The ads would appear on Backpage on average six times a day. Jane Doe No. 2 was given a prepaid mobile phone to answer calls from would-be customers generated by the Backpage ads. As a result of the ads, she was coerced into 5–15 sex transactions every day. Like the ads of Jane Doe No. 1, those of Jane Doe No. 2 featured her photograph. The ads were placed using a prepaid credit card. Altogether, Jane Doe No. 2 was raped over 900 times while in the thrall of her pimp.

Jane Doe No. 3 was trafficked on Backpage in December of 2013 by her pimp and one or more of his associates. The Backpage solicitations for the underage Jane Doe No. 3 described her as "new," "sweet," and "playful." As with the other Jane Does, the ads were paid for with a prepaid credit card. Jane Doe No. 3 was also given a mobile phone to take calls and texts from customers. She was taken to a hotel in Foxborough, Massachusetts, where she was raped by men who responded to the ads. Photos of Jane Doe No. 3, including one that she had taken of herself, appeared with the ads on Backpage.[2]

---

2. At some point, Jane Doe No. 3's parents became aware of the ads featuring their daughter on Backpage and demanded that

The Doe plaintiffs brought this lawsuit in October of 2014. In their Second Amended Complaint, they allege that defendants' business practices violate the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 18 U.S.C. § 1595 (Count I); the Massachusetts Anti-Human Trafficking and Victim Protection Act of 2010 (MATA), Mass. Gen. Laws ch. 265, § 50 (Count II); and constitute unfair and deceptive business practices under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 9 (Count III). The Doe plaintiffs also bring claims for unauthorized use of pictures of a person, Mass. Gen. Laws. ch. 214, § 3A and R.I. Gen. Laws § 9–1–28 (Count IV), and copyright infringement (specific to the photograph taken by Jane Doe No. 3 of herself) (Count V). In January of 2015, defendants moved to dismiss the Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6). The parties and several amici curiae [3] filed helpful briefs. The court heard oral argument on April 15, 2015.

## DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations of a complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Thomas v. Rhode Island,* 542 F.3d 944, 948 (1st Cir.2008). As the Supreme Court has emphasized, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citations and quotation marks omitted).

Defendants rely primarily on the immunity provided by Congress in enacting 47 U.S.C. § 230, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," *id.* § 230(c)(1), and the concomitant preemption of "cause[s] of action . . . brought . . . under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).[4] There is no dispute that defendants are, as the operators of Backpage, providers of an

---

they be taken down. A week later, the illicit ads still appeared on the website.

**3.** The City and County of San Francisco, the City of Atlanta, the City and County of Denver, the City of Houston, the City of Philadelphia, and the City of Portland (Oregon) (collectively the local government amici) and the Commonwealth of Massachusetts submitted two amicus briefs in support of plaintiffs. The Electronic Frontier Foundation, the Center for Democracy & Technology, and Professor Eric Goldman (of Santa Clara University School of Law) (collectively EFF) submitted an amicus brief in support of defendants.

**4.** The Doe plaintiffs argue that the court should first assess the plausibility and sufficiency of the factual allegations relevant to each claim before reaching the immunity issue. However, the entitlement to immunity under section 230 is not only an affirmative defense, but also the right to be immune from being sued. *See, e.g., Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1125 (9th Cir.2003); *accord Klayman v. Zuckerberg,* 753 F.3d 1354, 1357 (D.C.Cir.2014) (Section 230 "can [] support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint."); *Ricci v. Teamsters Union Local 456,* 781 F.3d 25, 28 (2d Cir. 2015) (same). As the Supreme Court counsels, a claim of entitlement to immunity should be "resolv[ed] . . . at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

interactive computer service. Defendants contend that because the Doe plaintiffs allege they were harmed by the contents of postings that defendants had no part in creating, the claims fall squarely within Congress's exemption of interactive computer service providers from liability for third-party Internet content.

Congress enacted section 230 in 1996, while the Internet was still in its infancy. Congress explained the purposes of the law in five pertinent findings:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

47 U.S.C. § 230(a). Consistent with these findings, section 230 reflects the "policy of the United States"

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

*Id.* § 230(b).

The Doe plaintiffs argue that because the Internet has matured since the enactment of section 230, the principal policy consideration that animated Congress (promoting the growth of the Internet by insulating it from regulatory restrictions and lawsuits) no longer has the assuasive force that it may once have had. They cite the characterization of section 230's immunity guarantee as an affirmative defense in cases like *Klayman* and *Ricci* as evidence that the courts have been whittling back the scope of section 230 immunity as the Internet has shed its training wheels. *See Klayman*, 753 F.3d at 1357; *Ricci*, 781 F.3d at 28. The argument, however, does not bear scrutiny. Both the *Klayman* and *Ricci* courts, whatever the label they used to describe section 230's effect, found the interactive computer service providers at issue to be immune from any imputation of liability for third-party speech. *Klayman*, 753 F.3d at 1357–1359; *Ricci*, 781 F.3d at 27–28. Moreover, Congress, far from low-

ering the immunity bar, ratcheted it up in 2010 by expanding the scope of section 230 immunity to preempt the enforcement of inconsistent foreign judgments. *See* 28 U.S.C. § 4102(c)(1).[5]

The local government amici attempt to repackage Backpage as an "information content provider," an entity that section 230 defines as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Their ultimate point is that information content providers are excluded from the immunity granted by section 230. The amici contend that Backpage generates content by: (1) posting illegal materials in sponsored ads; (2) stripping metadata from posted photos; (3) coaching the crafting of ads by allowing misspellings of suggestive terms; and (4) designing the escorts section of the website in such a way as to signal to readers that sex with children is sold here. The amici argument relies heavily on *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157 (9th Cir.2008). In that case, the Ninth Circuit determined Roommates.com, a roommate matching service, to be an "information content provider" shorn of section 230 immunity because it elicited information about personal characteristics of users that is forbidden by the Fair Housing Act. *Id.* at 1169–1170. The Court reasoned that

> Roommate's connection to the discriminatory filtering process is direct and palpable: Roommate designed its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children. Roommate selected the criteria used to hide listings, and Councils allege that the act of hiding certain listings is itself unlawful under the Fair Housing Act, which prohibits brokers from steering clients in accordance with discriminatory preferences.

*Id.*

To get to its result, the Court in *Roommates* attempted to draw a line between active control of the content of a web posting and the provision of a neutral interactive service that simply replicates offending third-party matter.[6]

> If an individual uses an ordinary search engine to query for a "white roommate," the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to "development" for purposes of the immunity exception.... Similarly, a housing website that allows users to specify whether they will or will not receive emails by means of *user-defined* criteria might help some users exclude email from other users of a particular race or sex. However, that website would be immune, so long as it does not **require** the use of discriminatory criteria. A website operator who edits user-created content—such as by correcting spelling, re-

5. Section 4102(c)(1) reads as follows: "Notwithstanding any other provision of Federal or State law, a domestic court shall not recognize or enforce a foreign judgment for defamation against the provider of an interactive computer service, as defined in section 230 of the Communications Act of 1934 (47 U.S.C. § 230) unless the domestic court determines that the judgment would be consistent with section 230 if the information that is the subject of such judgment had been provided in the United States."

6. *Roommates* is one of the few sentinels denying section 230 immunity left standing among some 300 cases (as of 2012) that have decided the issue. *See Hill v. StubHub, Inc.,* 219 N.C.App. 227, 239, 727 S.E.2d 550 (2012).

moving obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality.

*Id.* at 1169 (bold emphasis added). This latter passage lays out the distinction that afforded immunity to craigslist.com, an online classifieds forum that also published discriminatory housing ads. "Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination; for example, craigslist does not offer a lower price to people who include discriminatory statements in their postings." *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 671–672 (7th Cir.2008).

Singly or in the aggregate, the allegedly sordid practices of Backpage identified by amici amount to neither affirmative participation in an illegal venture nor active web content creation. Nothing in the escorts section of Backpage requires users to offer or search for commercial sex with children. The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal. The creation of sponsored ads with excerpts taken from the original posts reflects the illegality (or legality) of the original posts and nothing more. Similarly, the automatic generation of navigational path names that identify the ads as falling within the "escorts" category is not content creation. *See Seldon v. Magedson,* 2014 WL 1456316, at *5–6 (D.Ariz. April 15, 2014). The stripping of metadata from photographs is a standard practice among Internet service providers. Hosting anonymous users and accepting payments from anonymous sources in Bitcoins, peppercorns, or whatever, might have been made illegal by Congress, but it was not. Backpage's passivity and imperfect filtering system may be appropriate targets for criticism, but they do not transform Backpage into an information content provider.

Although the Doe plaintiffs recognize that defendants did not author the content of the offending ads, *see* Opp'n at 16 ("Plaintiffs' trafficking claims do not seek to 'impute' to [d]efendants any advertisements created by others"), they challenge the breadth of the immunity sought by defendants. Count I alleges a violation of a section of the TVPRA, a federal statute that criminalizes sex trafficking. As the Doe plaintiffs note, section 230 expressly states that "[n]othing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or *any other Federal criminal statute.*" 47 U.S.C. § 230(e)(1) (emphasis added). Plaintiffs contend that defendants' business practices, "even if the advertisements had never been posted," Opp'n at 16, are sufficient to make out a violation of the TVPRA. Furthermore, according to the Doe plaintiffs, section 230 only immunizes "action voluntarily taken in *good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A) (emphasis added). The Doe plaintiffs argue that their claims are of a different sort—they allege that defendants have intentionally and in bad faith hidden behind ineffectual counter-trafficking measures to deflect the scrutiny of law enforcement and social services agencies. Count II alleges a violation of the MATA, the Massachusetts analog to the TVPRA. The Doe plaintiffs argue that, because claims under the TVPRA are exempt from the scope of section 230's immunity, the claim under MATA does not depend on

"*inconsistent* state law" preempted by section 230. Count III, which presses a claim of unfair and deceptive businesses practices under Massachusetts law, is alleged to arise not from the posted ads and their contents, but from the architecture of Backpage itself, which the Doe plaintiffs contend is constructed to conceal illegal activity from law enforcement. Finally, the Doe plaintiffs rely on Congress's stricture that section 230 "shall not be construed to limit or expand any law pertaining to intellectual property," *id.* § 230(e)(2), as preserving the intellectual property claims (unauthorized publicity and copyright infringement).[7] I will examine the viability of each count in turn.

### Civil Remedy under the TVPRA

■ 18 U.S.C. § 1595 provides victims of trafficking the right to bring a private civil action for restitution against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." The parties dispute whether a civil action authorized by a criminal statute can be construed as "enforcement of ... a Federal criminal statute" exempt from the immunity provided by section 230(e)(1).[8]

The Doe plaintiffs maintain that the statutory language, "enforce[ing] ... a Federal criminal statute," implies more than a dependence on criminal prosecution alone. *See* Black's Law Dictionary (10th ed.2014) (to "enforce" is "[t]o give force or effect to" or "[l]oosely, to compel a person to pay damages for not complying with...."). Further, plaintiffs contend that civil actions are frequently authorized as part and parcel of the enforcement regime behind criminal statutes. *See Luka v. Procter & Gamble Co.,* 785 F.Supp.2d 712, 719. (N.D.Ill.2011) ("[C]ivil enforcement mechanisms [ ] permit private parties to sue *to enforce* statutory prohibitions." (emphasis added)). Plaintiffs also rely on *dicta* in *Nieman v. Versuslaw, Inc.,* 2012

---

7. Defendants do not rely on section 230 immunity with respect to the copyright infringement claim, but contend, to be discussed *infra,* that it should be dismissed on other grounds.

8. The Doe plaintiffs, citing *Barnes v. Yahoo!,* 570 F.3d 1096 (9th Cir.2009), also contend that their TVPRA claim falls outside of the protections of section 230 immunity because section 1595 imposes a duty of care on defendants wholly independent of their role as publishers of speech. In *Barnes,* the Ninth Circuit barred a negligent undertaking claim under Oregon law that sought to hold Yahoo liable for an alleged failure to remove indecent profiles of a plaintiff that had been posted by her ex-boyfriend because the claim attempted to impose publisher liability on Yahoo for content created by a third party. *Id.* at 1102–1105 ("The word 'undertaking,' after all, is meaningless without the following verb. That is, one does not merely undertake; one undertakes *to do* something. And what is the undertaking that Barnes alleges Yahoo failed to perform with due care? The removal of the indecent profiles that her former boyfriend posted on Yahoo's website. But removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove.").

The Court did, however, allow a claim of promissory estoppel to stand on the allegation that a Director of Communications at Yahoo had contacted plaintiff and promised to remove the offending ads, but failed to do so in a timely manner. *Id.* at 1107–1109. "Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication." *Id.* at 1107. There is no claim by the Doe plaintiffs that any such assurance was given to them by Backpage. As *Barnes* illustrates, the existence of a statutory remedy without more does not give rise *mirabile dictu* to a tort duty. If it did, there would no need to create such a remedy in the first place.

WL 3201931, at *9 (C.D.Ill. Aug. 3, 2012), surmising that section 230 "arguably ... may not be used to bar a civil RICO claim because that would impair the enforcement of a Federal criminal statute."

Defendants, for their part, point out that courts have consistently rejected this argument in a section 230 immunity context. In *Doe v. Bates*, 2006 WL 3813758 (E.D.Tex. Dec. 27, 2006), the court held that Yahoo could not be held civilly liable for allegedly knowingly hosting child pornography on a user site styled as the Candyman e-group. The Magistrate Judge examined "th[is] issue of first impression" in scholarly detail that is worth quoting at length. *Id.,* at *3.

> The plain text of the statute establishes that the 230(e)(1) exception does not encompass private civil claims. As argued by Defendant, the common definition of the term "criminal," as well as its use in the context of Section 230(e)(1), specifically excludes and is distinguished from civil claims. The term "criminal" is defined as "[c]onnected with the administration of penal justice." Black's Law Dictionary 302; *see also* American Heritage Dictionary of the English Language 430 (4th ed.2000) (defining "criminal" as "[r]elating to the administration of penal law"). The term "civil" is defined as follows: "[o]f or relating to private rights and remedies that are sought by action or suit, *as distinct from criminal proceedings.*" Black's Law Dictionary 262 (emphasis added). In addition, Congress' use of the word "enforcement" in Section 230(e)(1) again confirms that the exception refers to governmental action, not civil actions by a private litigant.

> Congress did not bifurcate any statutes as asserted by Plaintiffs. Rather, as noted by Defendant, it preserved the ability of law enforcement officials to enforce the federal criminal laws to their fullest extent while at the same time eliminating the ability of private plaintiffs to pursue service-provider defendants. Given the complexity of Title 18 and the availability of civil remedies in statutes throughout the criminal code, Congress achieved its intended result using simple language making it clear that Section 230's limits on civil liability would not affect governmental enforcement of federal criminal laws.

As noted by Defendant, Plaintiffs' invocation of Section 230(e)(1) rests on their generalized policy arguments rather than the text of the statute. Plaintiffs' core argument appears to be that Section 230(e)(1) must exempt civil claims under the child pornography statutes because child pornography is "not to be tolerated" and "[i]f the prospect of civil liability provides a disincentive for engaging in child pornography over and above that provided by the prospect of fines and jail time, then that is a good thing."

Child pornography obviously is intolerable, but civil immunity for interactive service providers does not constitute "tolerance" of child pornography any more than civil immunity from the numerous other forms of harmful content that third parties may create constitutes approval of that content. Section 230 does not limit anyone's ability to bring criminal or civil actions against the actual wrongdoers, the individuals who actually create and consume the child pornography. Here, both the neighbor [who created the child pornography] and the moderator of the Candyman web site have been prosecuted and are serving sentences in federal prison. Further, the section 230(e)(1) exemption permits law enforcement authorities to bring criminal charges against even interactive service providers in the event

that they themselves actually violate federal criminal laws.

Regarding civil liability, however, Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws. As Defendant explained in its briefing, the reason is evident. If civil liability were possible, the incentive to bring a civil claim for the settlement value could be immense, even if a plaintiff's claim was without merit. Even if it ultimately prevailed, the service provider would face intense public scrutiny and substantial expense. Given the millions of communications that a service provider such as Defendant enables, the service provider could find itself a defendant in numerous such cases. Congress determined that it wanted to eliminate the resulting disincentives to the development of vibrant and diverse services involving third-party communication, while maintaining the ability of criminal prosecutions by the government for violations of federal criminal law. In sum, Congress did intend to treat civil and criminal claims differently and carefully crafted Section 230(e)(1) to achieve exactly that result. Plaintiffs' claim, although novel, is untenable and without merit.

*Id.*, at *21–22.

The District Judge adopted the Magistrate Judge's opinion, also noting that

[t]he legislative history [ ] buttresses the Congressional policy against civil liability for internet service providers. One key proponent of an amendment containing the language of § 230 at issue explained that "the existing legal system provides a massive disincentive for the people who might best help us control the Internet to do so." 141 Cong. Rec. H8469. Several legislators identified "obscenity" in particular as material that

could be more freely regulated as a result of the immunity provided by the statute. Another proponent noted that "[t]here is no way that any of [the internet service providers], like Prodigy, can take the responsibility to edit out information that is going to be coming in to them from all manner of sources onto their bulletin board. . . . We are talking about . . . thousands of pages of information every day, and to have that imposition imposed on them is wrong." *Id.* at H8471. The House approved the amendment by a vote of 410 to 4. *Id.* at H8478.

*Id.*, at *4. The court concluded that on the basis of this legislative history, "Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws." *Id.*, at *5.

In *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC,* 809 F.Supp.2d 1041 (E.D.Mo.2011), the court adopted the reasoning of *Bates* and rejected the *identical* argument from plaintiff, a victim of child sex trafficking, that section 230 carved out an exemption for the civil claim that she had brought against Backpage under 18 U.S.C. § 1595. *Id.* at 1055–1056. Similarly, in *Obado v. Magedson,* 2014 WL 3778261 (D.N.J. July 31, 2014), the court rejected plaintiff's effort to claim private redress for defendants' alleged criminal conspiracy to violate his rights. *Id.*, at *8. "Even if Plaintiff had alleged any facts to sustain this claim, the CDA exception for federal criminal statutes applies to government prosecutions, not to civil private rights of action under stat[utes] with criminal aspects." *Id.*

Although the Doe plaintiffs challenge this line of cases as "flawed," the court is persuaded that criminal and civil actions differ in kind and that section 230 exempts only criminal prosecutions. Section 1595

itself recognizes that although a private right of action may be complementary to government interests in combating trafficking, a civil action primarily vindicates private interests and must take a back seat to a criminal prosecution. *See* 18 U.S.C. § 1595(b)(1) ("Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim."). The court also finds persuasive amici EFF's argument that only criminal prosecutions are exempted from section 230's immunity because they are subject to the filter of prosecutorial discretion and a heightened standard of proof, making them less likely to have a chilling effect on the freedom of online speech.[9]

■ The Doe plaintiffs' next argument, that section 230 only immunizes "good faith" efforts to restrict access to offensive materials, has also failed to find support in the decided cases. Section 203(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(c)(2) further provides that

> [n]o provider or user of an interactive computer service shall be held liable on account of—

> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, ha-

rassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

■ Where section 230(c)(1) exempts an interactive service provider from liability for publishing third-party content, section 230(c)(2) also immunizes these providers from liability for actions taken in good faith to restrict offensive content.

[Section] 230(c)(1) contains no explicit exception for impermissible editorial motive, whereas § 230(c)(2) does contain a "good faith" requirement for the immunity provided therein. That § 230(c)(2) expressly provides for a good faith element omitted from § 230(c)(1) indicates that Congress intended not to import a subjective intent/good faith limitation into § 230(c)(1). "[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118[ ] (1993). Accordingly, the text of the two subsections of § 230(c) indicates that (c)(1)'s immunity applies regardless of whether the publisher acts in good faith.

*Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *7 (N.D.Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir.2014).[10]

9. Defendants also contend that plaintiffs fail to make out a case under 18 U.S.C. § 1595 because they do not allege that defendants shared the traffickers' criminal intent. Plaintiffs counter that section 1595 imposes liability not only for aiding and abetting, but more broadly for *"participation* in a venture which that person knew or should have known has

engaged in an act in violation of this chapter." *Id.* § 1595(a) (emphasis added). The court need not decide this issue because it holds that this claim is preempted by section 230 immunity.

10. Because the CDA immunizes Backpage from private litigants seeking redress under civil law, the parallel state law claim under

*Unfair and Deceptive Business Practices*

■ The Doe plaintiffs contend that the claim for unfair and deceptive business practices under the Massachusetts Consumer Protection Act, Gen. Laws ch. 93, § 9, survives section 230 immunity because it does not depend on the content of the advertisements themselves, but rather on the "deceptive" design of Backpage. Without the offending ads, however, no nexus would exist between Backpage and the harms suffered by the Doe plaintiffs. Their theory—that absent the permissive website design and imperfect filtering, their pimps would not have trafficked them or, if they had attempted to do so, law enforcement would have scrutinized Backpage more closely and would possibly have intervened to prevent their injuries—is too speculative to fall as a matter of law within the penumbra of reasonably foreseeability.

Moreover, courts have repeatedly rejected this "entire website" theory as inconsistent with the substance and policy of section 230. In *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007), the First Circuit refused to hold Lycos (a search engine) liable for the "construct and operation" of its website. *Id.* at 422. "Lycos's decision not to reduce misinformation by changing its web site policies was as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting. Section 230 immunity does not depend on the form that decision takes." *Id.; see also StubHub, Inc.*, 219 N.C.App. at 245,

727 S.E.2d 550 (rejecting the "entire website" approach in determining whether the Internet ticket marketplace may be held responsible for scalpers' unfair or deceptive trade practices); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 257 (4th Cir.2009) (finding a "structure and design" approach inapplicable where, unlike in *Roommates*, the design of website did not "require[ ] users to input illegal content as a necessary condition of use.").[11]

■ Also problematic is the suggestion that either knowledge or tacit encouragement of illegal content (but not the content itself) can be the basis for interactive web services liability. "It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420; *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir.1997) ("The simple fact of notice surely cannot transform one from an original publisher to a distributor in the eyes of the law."). Moreover,

> there is simply no authority for the proposition that [encouraging the publication of defamatory content] makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site.... Unless Congress amends the [CDA], it is legally (although perhaps not ethically) beside the point whether defendants refuse to remove the material, or how they might use it to their advantage.

the MATA is necessarily inconsistent with, and therefore preempted by, the CDA.

11. Court have also rejected consumer protection claims under section 230(c)(1) that seek to hold interactive service providers liable for third-party content. *See, e.g., Lycos*, 478 F.3d at 421–422 (Florida securities and cyberstalk-

ing laws); *Hinton v. Amazon.com.dedc*, 72 F.Supp.3d 685, 686–87, 2014 WL 6982628, at *1 (S.D.Miss. Dec. 9, 2014) (Mississippi Consumer Protection Act); *Obado*, 2014 WL 3778261, at *1 (New Jersey Consumer Fraud Act); *Goddard v. Google*, 2008 WL 5245490, at *1 (N.D.Cal. Dec. 17, 2008) (California Unfair Competition Law).

*Ascentive, LLC v. Opinion Corp.*, 842 F.Supp.2d 450, 476 (E.D.N.Y.2011) (internal quotation marks omitted, ellipsis in original). Indeed,

> an encouragement test would inflate the meaning of "development" to the point of eclipsing the immunity from publisher-liability that Congress established. Many websites not only allow but also actively invite and encourage users to post particular types of content. Some of this content will be unwelcome to others—*e.g.*, unfavorable reviews of consumer products and services, allegations of price gouging, complaints of fraud on consumers, reports of bed bugs, collections of cease-and-desist notices relating to online speech. And much of this content is commented upon by the website operators who make the forum available. Indeed, much of it is "adopted" by website operators, gathered into reports, and republished online. Under an encouragement test of development, these websites would lose the immunity under the CDA and be subject to hecklers' suits aimed at the publisher. Moreover, under the district court's rule, courts would then have to decide what constitutes "encouragement" in order to determine immunity under the CDA—a concept that is certainly more difficult to define and apply than the Ninth Circuit's material contribution test. *See Zeran*, 129 F.3d at 333. Congress envisioned an uninhibited, robust, and wide-open internet, *see* § 230(a)(1)-(5), but the muddiness of an encouragement rule would cloud that vision. Accordingly, other courts have de-

clined to hold that websites were not entitled to the immunity furnished by the CDA because they selected and edited content for display, thereby encouraging the posting of similar content.

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 414-415 (6th Cir. 2014).[12]

### Right of Publicity

■ Mass. Gen. Laws ch. 214, § 3A, provides that

> [a]ny person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof; and may recover damages for any injuries sustained by reason of such use.

R.I. Gen. Laws § 9-1-28 provides in almost identical language that

> [a]ny person whose name, portrait, or picture is used within the state for commercial purposes without his or her written consent may bring an action in the superior court against the person so using his or her name, portrait, or picture to prevent and restrain the use thereof, and may recover damages for any injuries sustained by reason of such use.

Accepting, *dubitante*, the Doe plaintiffs' assertion that the right to publicity constitutes an intellectual property claim exempt from immunity under section 230,[13] the

---

**12.** Defendants also argue that the Chapter 93A claim, in so far as it is based on alleged misrepresentations to law enforcement and social services agencies, lacks an essential foundational element because law enforcement and social services agencies have no connection in a commercial context to defendants as "consumers" of goods and services.

**13.** Although certain publicity rights are akin to "intellectual property" rights, a person's image is not a "product of the human intellect." Black's Law Dictionary (10th ed.2014). "[T]he right of publicity flows from the right to privacy," *Alvarez Guedes v. Marcano Martinez*, 131 F.Supp.2d 272, 278 (D.P.R.2001) (citing numerous cases), which is an intangi-

court agrees with defendants that plaintiffs have not pled plausible claims for unauthorized use of their images. Plaintiffs do not allege that defendants used their images to extract any direct benefit (such as featuring plaintiffs on advertisements *for* Backpage). Rather, the allegation is that defendants benefitted incidentally from the fee charged for posting advertisements with the Doe plaintiffs' pictures in the escorts section of the website. The argument, however, has been explicitly rejected by the Massachusetts Supreme Judicial Court.[14]

> [T]the crucial distinction under G.L. c. 214, § 3A, must be between situations in which the defendant makes an incidental ·use of the plaintiff's name, portrait· or picture and those in which the defendant uses the plaintiff's name, portrait or picture deliberately to exploit its value for advertising or trade purposes.

*Tropeano v. Atl. Monthly Co.*, 379 Mass. 745, 749, 400 N.E.2d 847 (1980). " 'The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness.' " *Id., quoting Nelson v. Maine Times*, 373 A.2d 1221, 1224 (Me.1977) (in turn quoting Restatement (Second) of Torts § 652C, cmt. d (1977)); *see also Intercity Maint. Co. v. Local 254 Serv. Employees Int'l Union*, 62 F.Supp.2d 483, 506 (D.R.I.1999), *aff'd in part, vacated in part on other grounds, remanded sub nom. Intercity Maint. Co. v. Local 254, Serv. Employees Int'l Union AFL–CIO*, 241 F.3d 82 (1st Cir.2001) ("The Rhode Island legislature borrowed the Privacy Act's scheme of four privacy torts, including the tort of false light, from the doctrine of privacy torts promulgated by the *Restatement (Second) of Torts. See Liu v. Striuli*, 36 F.Supp.2d 452, 479 (D.R.I. 1999); *Restatement (Second) of Torts* §§ 652B–E (establishing the four privacy torts). Accordingly, Rhode Island courts have often turned to the *Restatement* as an authority on the matter of privacy torts.").

*Copyright Infringement*

▮▮▮ Jane Doe No. 3 obtained a registration for her photograph on December

---

ble right of a different nature. Despite the Doe plaintiffs' attorney's contention at oral argument that a photograph may be copyrightable, it does not follow that the underlying image is *ipso facto* protectable under intellectual property law. *See Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264 (10th Cir.2008) ("Recognizing that Oscar Wilde's inimitable visage does not belong, or 'owe its origins' to any photographer, the Supreme Court noted that photographs may well ·sometimes lack originality and are thus not *per se* copyrightable.... [P]hotographs are copyrightable, if only to the extent of their *original* depiction of the subject. Wilde's image is not copyrightable; but to the extent a photograph reflects the photographer's decisions regarding pose, positioning, background, lighting, shading, and the like, those elements can be said to 'owe their origins' to the photographer, making the photograph copyrightable, at least to that extent."), *citing Burrow–Giles Lithographic Co.*

*v. Sarony*, 111 U.S. 53, 59, 4 S.Ct. 279, 28 L.Ed. 349 (1884). Courts also disagree as to whether state law intellectual property claims are exempted under section 230. *Compare Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th Cir.2007) ("In the absence of a definition from Congress, we construe the term "intellectual property" to mean 'federal ·intellectual·property.' ") *with Doe v. Friendfinder Network, Inc.*, 540 F.Supp.2d 288, 302 (D.N.H.2008) ("[Section] 230(e)(2) applies simply to 'any law pertaining to intellectual property,' not just federal law.").

14. "[A]s a federal court considering state law claims, we must apply the state's law on substantive issues and 'we are bound by the teachings of the state's highest court.' " *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir.2007), *citing N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 37–38 (1st Cir.2001).

18, 2014, after this lawsuit was filed. Although registration is not a jurisdictional prerequisite of bringing a suit for copyright infringement, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010), it is a "condition precedent for obtaining certain remedies, such as statutory damages and attorneys' fees." *Johnson v. Gordon*, 409 F.3d 12, 20 (1st Cir.2005); *see also* 17 U.S.C § 412 ("[N]o award of statutory damages or of attorney's fees ... shall be made for—(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration.").

The only recovery remaining open to Jane Doe No. 3 is compensatory damages under 17 U.S.C. § 504. Section 504 permits recovery of "the actual damages suffered by [ ] her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." With respect to the latter, Jane Doe No. 3 alleges that "[t]he Backpage Defendants derive a financial benefit directly attributable to the public display of such photographs by virtue of the payment of fees by the pimps and traffickers to Backpage.com." SAC ¶ 139. However, she may only recover profits from defendants that are causally linked to specific acts of infringement. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 159–161 (2d Cir.2001). Here no plausible link exists between defendants' generalized profits and any common-law copyright vesting in Jane Doe No. 3's photo for the simple reason that the fee for posting an ad is the same whether or not it includes a photograph. Jane Doe No. 3 does not allege that she suffered any loss of revenues or licensing fees for her photo as a result of the infringement (nor does she allege that the protectable elements of the photo, *see* n. 12 *supra*, have any market value). Because she does not plead any redressable damages, Jane Doe No. 3's copyright infringement claim must also be dismissed.

\*     \*     \*

To avoid any misunderstanding, let me make it clear that the court is not unsympathetic to the tragic plight described by Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3. Nor does it regard the sexual trafficking of children as anything other than an abhorrent evil. Finally, the court is not naïve—I am fully aware that sex traffickers and other purveyors of illegal wares ranging from drugs to pornography exploit the vulnerabilities of the Internet as a marketing tool. Whether one agrees with its stated policy or not (a policy driven not simply by economic concerns, but also by technological and constitutional considerations), Congress has made the determination that the balance between suppression of trafficking and freedom of expression should be struck in favor of the latter in so far as the Internet is concerned. Putting aside the moral judgment that one might pass on Backpage's business practices, this court has no choice but to adhere to the law that Congress has seen fit to enact.

## ORDER

For the foregoing reasons, defendants' motion to dismiss the Second Amended Complaint is *ALLOWED*. The Clerk is directed to enter judgment accordingly and close this case.

SO ORDERED.